**UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT**

_____

**In re:**
    **Melissa Willette,**
            **Debtor.**

Filed & Entered
On Docket
October 17, 2008

**Chapter 13 Case
# 07-10593**

_____

*Appearances:*  Kathleen Walls, Esq.    Jan Sensenich, Esq.    Nancy M. Geise, Esq.   Alan A. Bjerke, Esq.
               Middlebury, VT          White River Jct., VT   Kolvoord, Overton      Bauer, Gravel, Nuovo,
               For the Debtor          Chapter 13 Trustee     & Wilson, P.C.         Parker & Lang
                                       Pro Se                 Essex Jct., VT         Burlington, VT
                                                              For Griswold & Co.     For LTS Homes, Inc.

**MEMORANDUM OF DECISION
SUSTAINING IN PART AND OVERRULING IN PART
CREDITORS' OBJECTIONS TO CONFIRMATION**

      Two Creditors, S.T. Griswold & Company and LTS Homes, Inc. (the "Creditors"), object to the Debtor's Second Amended Plan on the ground that the Debtor is not devoting all of her monthly disposable income to her plan (doc. # 93). In particular, the Creditors contend that the Debtor had no interest in her homestead property (the "Property") on the day she filed her chapter 13 bankruptcy petition and therefore she had no right to deduct her mortgage payment as a monthly expense on the bankruptcy case means test. As a corollary, they argue that since the Property was sold before the Debtor presented a confirmable plan, she also had no right under 11 U.S.C. § 1322[1] to reinstate her mortgage through chapter 13 (doc. # 111, 123).

      At a hearing on September 4, 2008, the Court issued an oral ruling on the Creditors' objections, set a confirmation hearing for October 8, 2008, and stated that a written decision on the objections would follow. On September 9, 2008, the Court entered an Order dismissing the case (doc. # 128), based upon the Creditors' unopposed motion. The Court issues this decision to set forth the rationale for its ruling on the Creditors' objections to the plan.

**ISSUES PRESENTED**

      In order to adjudicate the Creditors' objections to confirmation, the Court must address four issues that arise at the intersection of Vermont foreclosure law, amended in 2005, and the Bankruptcy Code, also amended in 2005. First, did the Debtor have any interest in the Property on the date she filed her petition, when the strict foreclosure redemption period set out in the state court judgment of foreclosure had expired but the foreclosure sale had not yet occurred? Second, if the Debtor had an interest in the Prop-

---

[1] All statutory citations refer to Title 11 United States Code (the "Bankruptcy Code"), unless otherwise indicated.

erty on the date she filed her petition, did § 1322 of the Bankruptcy Code permit her to de-accelerate and reinstate the mortgage and cure the mortgage payment default? Third, could the Debtor deduct her mortgage payment as a monthly expense on the means test for purposes of computing her plan payment, even though the Bankruptcy Court had granted the mortgagee relief from stay and the Debtor had been evicted from the Property? Fourth, if the Debtor could deduct her mortgage payment on the means test, was that figure her regular monthly mortgage payment or the accelerated mortgage debt divided by the number of months spanned by the plan?

For the reasons set forth below, the Court holds that: (1) the Debtor had an interest in the Property on the date she filed her bankruptcy petition; (2) § 1322 permits the Debtor to de-accelerate and reinstate her mortgage, and cure the default; (3) it was proper for the Debtor to deduct the mortgage payment on the means test; and (4) the proper figure to include on the means test was the monthly payment due under the mortgage contract. Therefore, the Court overrules in part, and sustains in part, the Creditors' objections to the plan.

### JURISDICTION

This contested matter constitutes a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(A) & (L) and § 1334.

### MATERIAL FACTS AND PROCEDURAL HISTORY

**I. The State Court Proceedings**

The material facts are not in dispute. In January 2006, the mortgagee, Eastern Savings Bank (the "Bank"), filed a Complaint of Foreclosure[2] in Chittenden Superior Court against the Debtor, her husband, and others. See Ex. A to doc. # 102. On April 23, 2007, the state court issued a Judgment and Decree of Foreclosure.[3] On June 21, 2007, the state court issued a "First Amended Judgment Order and Decree of Foreclosure and Order for Public Sale" ("Amended Judgment") which declared that if the Debtor failed to redeem the Property by the redemption deadline of June 25, 2007, she would be "foreclosed and forever barred from all equity of redemption in the said premises," the Court would issue a Certificate of Non-Redemption, and the Court Clerk could "upon [the Bank's] request, issue a Writ of Possession in favor of [the Bank], and cause the real estate to be sold as a whole at public sale. . . pursuant to 12 V.S.A. § 4531 et seq." Id. The Amended Judgment described, inter alia, how the Bank was to advertise the sale, to whom the notice of sale was to be sent, and the forms of payment that would be accepted. Id. It also provided that the public sale would be held at the premises "on a certain date and time" and the Property would be sold to the highest bidder. Id.

---

[2] The record in this Court does not contain a copy of the Complaint of Foreclosure. From the text of the Amended Judgment, the Court presumes that the complaint sought strict foreclosure.
[3] The record in this Court does not contain a copy of the April 2007 state court judgment.

2

On July 9, 2007, the state court issued a Certificate of Non-Redemption, which repeated the language in the Amended Judgment that the Debtor was "foreclosed and forever barred from all equity of redemption of the land and premises of record," and declared that the Bank was entitled to a Writ of Possession. Id. The complaint and judgments were duly filed in the land records. Id. The foreclosure sale was set for September 10, 2007.[4] (doc. # 26, ¶ 8).

## II.    Bankruptcy Court Proceedings

On September 7, 2007, three days before the scheduled foreclosure sale, the Debtor filed a chapter 13 petition (doc. # 1). After receiving an extension, the Debtor filed a proposed chapter 13 plan, schedules, and means test form on October 10, 2007 (doc. ## 14, 15). In her plan, the Debtor listed the value of her house at $230,000 and her mortgage arrearage at $52,239.13. She proposed to make regular monthly post-petition mortgage payments to the Bank directly ("outside the plan"), and to cure the mortgage arrearage through the monthly payments to the chapter 13 Trustee ("through the plan"). Id. The treatment of the mortgage debt is described on the expense portion of the means test (also known as Official Form 22C). The means test indicated that the Debtor's income was "above-median," which resulted in the term of her chapter 13 plan being set at five years (doc. # 14, lines 15-17). The answer to line 47 on the means test form is at the center of this controversy. Captioned "Future Payments on Secured Claims," line 47 has the following instructions:

> For each of your debts that is secured by an interest in property that you own, list the name of the Creditor, identify the property securing the debt, and state the Average Monthly Payment. The Average Monthly Payment is the total of <u>all amounts contractually due</u> to each Secured Creditor in the 60 months following the filing of the bankruptcy case, divided by 60.

Id. (emphasis added). On line 47(a), the Debtor included Eastern Savings Bank as the creditor, identified her home as the property securing the debt, and filled in $1,550.43 as the average monthly mortgage payment. Line 48 of the means test form, "Past Due Payments on Secured Claims," states:

> If any of debts [sic] listed in Line 47 are secured by your primary residence. . . you may include in your deduction 1/60th of any amount (the "cure amount") that you must pay the creditor in addition to the payments listed in Line 47, in order to maintain possession of the property. The cure amount would include any sums in default that must be paid in order to avoid repossession or foreclosure.

Id. On line 48(a), the Debtor referred again to Eastern Savings Bank and indicated $870.65 was the monthly amount she had to pay to maintain possession of the Property (i.e., to cure the mortgage arrears in order to avoid foreclosure). Id.  Based upon the Debtor's income and expenses, the bottom line of the means test form indicated that the Debtor had $775.64 in monthly disposable income under § 1325(b)(2) to pay to general unsecured creditors. Id.

In December 2007, the Bank brought a motion for relief from stay (doc. # 26). The next day, the

---

[4] The record in this Court does not contain a copy of the notice of sale for the September 10, 2007 foreclosure sale.

Debtor filed an amended means test form (doc. # 29), which contained the same figures on lines 47 and 48 as the previous means test, but reflected $323.64 in monthly disposable income (due to changes not pertinent to this dispute). The Debtor, thereafter, filed a timely objection (doc. # 35) to the lift stay motion. After a hearing in January 2008, the Court entered an order (doc. # 48) granting the Bank relief from stay against the Property. In March 2008, the Creditors moved for relief from the co-debtor stay under § 1301 (doc. ## 88, 89, 90), and that relief was granted at a May 2008 hearing. See doc. # 108. The foreclosure sale took place shortly thereafter.

On January 29, 2008, the Debtor filed a First Amended Plan (doc. # 55). On March 11, 2008, she filed a Second Amended Plan (doc. # 82) along with a third iteration of the means test (doc. # 83) that showed a monthly disposable income of minus $443.54 (line 59).

## III. The Parties' Arguments

The Creditors objected to both the First and Second Amended Plans. They claimed, inter alia, that: (1) the Debtor's plan failed to satisfy §§ 1322(a)(4) and 1325(b)(1)(B) because the plan overstated permissible expenses and did not propose to devote all of the Debtor's monthly disposable income to the plan; (2) the mortgage payments included in the means test were not "contractually due" under § 707(b)(2)(A)(iii)(I)[5] because the state court foreclosure judgment extinguished the Debtor's contractual mortgage payment obligation two months before the Debtor filed for bankruptcy relief; (3) as a result of the entry of the foreclosure judgment, the Debtor no longer had a legal right to reinstate her mortgage under § 1322 or otherwise restore the obligation and resume payments on this secured debt; (4) under the doctrine of merger, the Amended Judgment canceled the underlying contract and that to the extent any opportunity had existed to reinstate the mortgage during the redemption period, it had been extinguished by the issuance of the Certificate of Non-Redemption; and (5) the Debtor actually had $2,124.54 available per month to pay into the plan for the benefit of unsecured creditors, and the Second Amended Plan that proposed to pay only $741 to general unsecured creditors therefore failed to meet the statutory requirements for confirmation (doc. ## 79, 93, 111).

The Debtor responded that: (1) the state foreclosure judgment did not release her from her obligation under the contract or eliminate the Bank's right to collect the mortgage debt under the terms of the note, and therefore she was permitted to deduct her contractual mortgage payment on the means test; (2) §1322 allowed her to de-accelerate the delinquent home mortgage, reinstate the note, and cure the monetary default; (3) the foreclosure judgment did not extinguish her interest in the Property because the foreclosure by sale redemption date had not yet expired; and (4) the fact that the Bank obtained relief

---

[5] This provision states:
(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of –
    (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition[.]
11 U.S.C. § 707(b)(2)(A)(iii)(I) (emphasis added)

4

from stay, post-petition, was irrelevant to the content of the means test, the computation of monthly disposable income, and the determination of how much the Debtor must pay to general unsecured creditors (doc. ## 99, 110). The Debtor filed a fourth (and final) means test form on March 31, 2008, in which she inserted $3,025.17 on line 47(a) (representing the accelerated monthly mortgage amount divided by 60). This iteration of the means test showed a monthly disposable income of negative $990.61. (Ex. to doc. # 99).

The chapter 13 Trustee filed a Supplemental Memorandum of Law in support of the Debtor's position, asserting that the Debtor retained an ownership interest in the Property on the date she filed her petition and could therefore reinstate the mortgage and cure the arrears through chapter 13 (doc. # 120). He pointed out that, once the Debtor filed for bankruptcy protection, § 1322(c)(1) specifically permitted her to reinstate the mortgage note and cure the mortgage arrearage, since the foreclosure sale had not yet occurred. The Trustee relied on In re Taylor, 286 B.R. 275, 280 (D.Vt. 2002), for the proposition that § 1322, not Vermont foreclosure law, determined what rights a debtor had in property that was the subject of a pre-petition foreclosure judgment, and In re Taddeo, 685 F.2d 24, 26-27 (2d Cir. 1982), which held that a right to cure was a property interest sufficient to allow de-acceleration of a defaulted note in a chapter 13 case (doc. # 120). He insisted that the fact that the Debtor did not ultimately confirm a cure plan made no difference as to whether she could include her mortgage payment on the means test because the means test form was "a backward looking test" that the Debtor had completed without regard to post-petition transactions. Id. The Debtor filed another Supplemental Memorandum and a Response in which she echoed the Trustee's arguments (doc. ## 121, 124).

## DISCUSSION

I. **Did the Debtor Have an Interest in Her Homestead Property on the Date of Filing?**

    A.    State Foreclosure Law

The threshold issue in this case is whether the Debtor had an interest in the Property on the date she filed her chapter 13 petition. If she had no interest in the Property on that date, it would be outside of the bankruptcy estate, there would be no legal basis for her to deduct her mortgage payment on the means test form, and the Court would sustain the Creditors' objections to the Second Amended Plan. In order to determine whether property is included in a bankruptcy estate, see 11 U.S.C. § 541(a)(1), the Court looks to relevant state law, which creates and defines such interests. Butner v. United States, 440 U.S. 48, 55 (1979). The pertinent state law is the Vermont foreclosure statute.

In United States v. Bartlett (In re Bartlett), 353 B.R. 398 (Bankr. D.Vt. 2006), this Court described the impact of Vermont's strict foreclosure statute, 12 V.S.A. chapter 163, subchapter 6, on property that is the subject of a foreclosure action:

> Vermont is a title theory state. This means that "a mortgage conveys legal title to the

5

> mortgagee at the time the mortgage is granted." Town of Weathersfield v. Merchants Bank (In re Canney), 284 F.3d 362, 369 (2d Cir. 2002). In other words, all that the mortgagor holds while the mortgage debt on the property is outstanding is a "defeasible equitable interest known as the 'equity of redemption.'" In re Pellegrino, 284 B.R. 326, 328 n.8 (Bankr. D.Ct. 2002). Upon a mortgagor's payment default in Vermont and Connecticut, a mortgagee may pursue its rights through a strict foreclosure action – a process which does not involve a foreclosure sale. Upon such a default, "the court will normally set a time period in which the borrower may pay off or redeem the mortgage or debt. If the borrower fails to do so in the allotted time, the lender is given an immediate right to possession of the property." Canney, 284 F.3d at 369 n.6 (quoting Baxter Dunaway, The Law of Distressed Real Estate Foreclosure, Workouts, Procedure § 12.16 (1999)). Thus, if the mortgagor does not redeem the foreclosed property within the prescribed time, "the mortgagee can unify title in itself by foreclosing the mortgage, a process which involves, inter alia, the extinguishment of the mortgagor's 'equity of redemption.'" Pellegrino, 284 B.R. at 328 n.8. Pursuant to the Vermont strict foreclosure procedure, the foreclosing mortgagee "obtains full and complete title and has the right to sell the property and retain the surplus, if any." Stowe Ctr., Inc. v. Burlington Sav. Bank, 141 V. 634, 637, 451 A.2d 1114, 1115 (1982).

Id. (page numbers unavailable; footnotes omitted). According to the Vermont strict foreclosure statute, if the redemption period (as prescribed in the foreclosure order) has expired, and the mortgagor has not redeemed – by paying the full amount due on the accelerated debt – the clerk of the court "shall issue a writ of possession at the plaintiff's request." 12 V.S.A. § 4528(b).

Vermont statutes have long provided "exceptions" to strict foreclosure, permitting foreclosure by sale under two circumstances. It is permissible, under 12 V.S.A. § 4531(b), "if a lien or interest in such realty is held by any person or federal agency which may not be foreclosed by strict foreclosure pursuant to federal law," and under 12 V.S.A. § 4531a(a) and (b), if a "power of sale" is contained in a mortgage (allowing for judicial foreclosure and non-judicial foreclosure, respectively). The statutes provide guidance on the procedures, notices, and forms to be used when foreclosure is effectuated by sale (§ 4532), and the procedures that must be followed after a foreclosure sale (§§ 4533 and 4533a). Title 12 V.S.A. § 4532(i), entitled "Right of redemption by mortgagor," sets out the redemption period for foreclosure sales: "The mortgagor is entitled to redeem the premises at any time prior to the sale by paying the full amount due under the mortgage, including the costs and expenses of sale" (emphasis added).

Prior to the 2005 amendments to Vermont's strict foreclosure statutes, foreclosure by sale was the exception in Vermont, rather than the rule. See Canney v. Merchants Bank, 284 F.3d 362, 369 & n.6 (2d Cir. 2002) ("Strict foreclosure is the normal method of foreclosure . . . in . . . Vermont" and "Strict foreclosure does not involve a foreclosure sale.") (quotation omitted) (emphasis added); Taylor, 286 B.R. at 280 ("Vermont does not require a foreclosure sale to vest ownership in the mortgagee. . . ") The foreclosure landscape changed radically after the 2005 amendments.

Two of the amendments bear on the instant dispute. The first is the addition of subsection (a) to 12 V.S.A. § 4531, which expanded the exceptions to strict foreclosure and the circumstances under which

6

mortgagees could foreclose via judicial foreclosure sales.

> Strict Foreclosure Exception
>
> (a) <u>All liens and mortgages</u> affecting real property <u>may</u>, on the written motion of any party to any suit for foreclosure of such liens or mortgages, or at the discretion of the court before which the foreclosure proceedings are pending, <u>be foreclosed by a judicial foreclosure sale</u>, even if the mortgage does not contain a sale provision instead of a strict foreclosure.

12 V.S.A. § 4531(a) (2007) (effective May 5, 2006) (emphasis added). The second significant amendment, to 12 V.S.A. § 4528, mandated that courts make specific findings as a prerequisite to issuing a decree of strict foreclosure.

> No decree of strict foreclosure shall be issued absent a finding by the court <u>based upon competent evidence</u> presented by the party seeking such decree that <u>there is no substantial value in the property in excess of the mortgage debt</u> found by the court to be due to the plaintiff, plus assessed by unpaid property taxes due on the property.

12 V.S.A. § 4528(b) (effective May 5, 2006) (2007) (emphasis added).

On the other hand, the Legislature did not change the redemption period that had long been used in connection with strict foreclosure proceedings:

> If a decree is made foreclosing the right of redemption, the time of redemption shall be six months from the date of the decree unless a shorter time is ordered. . . .

12 V.S.A. § 4528(a) (2007).[6] Nor did it change the redemption period that applies when foreclosure is effectuated through sale, pursuant to § 4532(i), allowing the mortgagor to redeem any time prior to sale.

B. <u>Property Interests vis a vis the Amended Foreclosure Statute</u>[7]

    (i) <u>Issues Raised by the Amended Judgment</u>

In this case, the Bank initiated a strict foreclosure action against the Debtor. The Amended Judgment set a June 25, 2007 deadline by which the Debtor was to pay into the Court the accelerated mortgage debt ($162,201), plus per diem interest, in order to redeem the Property. The Amended Judgment provided that if she failed to pay that sum by that date, she would be "foreclosed and forever barred from all equity of redemption in said premises" and that "the Court Clerk may, upon Plaintiff's request . . . cause the real estate of the [Debtor]. . . to be sold as a whole at public sale, at the location of the real estate . . . pursuant to 12 V.S.A. Section 4531 <u>et</u> <u>seq</u>." (doc. # 102, Ex. A, ¶ 5). While the Amended Judgment specified how such a sale should be conducted, it did not set a sale date. What is problematic is that the Amended Judgment appears to have directed the Debtor to comply with the strict foreclosure redemption period and, at the same time, authorized a foreclosure by sale, which carries a distinct – and inevitably

---

[6] The Legislature did amend § 4528(a) to add that "The court shall fix the period of redemption taking into consideration whether there is value in the property in excess of the mortgage debt and debt owed to junior lienholders, any assessed but unpaid property taxes, the condition of the property, and any other equities."

[7] The Bank filed its foreclosure complaint before the effective date of the 2005 amendments, and the Amended Judgment was entered after the effective date of these new provisions. Since the Amended Judgment invokes the sale option pursuant to the amended foreclosure statute, this Court applies those provisions.

later – redemption date, without clarifying the relationship between the two redemption deadlines or specifying which redemption deadline applies in this situation where the Bank initiated a strict foreclosure but ultimately enforced its rights in the collateral through a foreclosure sale. Nor does the current foreclosure statute shed any light on how to reconcile the two redemption dates in such a circumstance.[8]

### (ii) Rules of Construction

In order to determine which redemption deadline takes precedence in this case, the Court seeks guidance from Vermont case law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding that, in order to unravel issues of state law, federal courts "must defer to the judgment of state courts on interpretations of state law"). Unfortunately, no state case law exists on this specific issue of dueling redemption dates, so the Court turns to the well-settled rules for construing ambiguous judgments in order to resolve this conundrum. See In re Scheiber, 168 Vt. 534, 539, 724 A.2d 475, 478 (Vt. 1998) (quoting Mazziotti v. Allstate Ins. Co., 240 Conn. 799, 695 A.2d 1010, 1014 (1997) for its holding that judgments are construed in the same manner as other written instruments and the determinative factor is the intention of the trial court "as gathered from all parts of the judgment"). The Court also takes into account the analysis of judgments presented in the respected AmJur treatise:

> In construing a judgment, it may be presumed that the court intended to render a valid, and not a void, judgment. Hence, if a judgment is susceptible of two interpretations, one of which would render it legal and the other illegal, the court will adopt the interpretation which will render the judgment legal. Further, <u>where a judgment is susceptible of two interpretations, that one will be adopted which renders it the more reasonable, effective, and conclusive, and which makes the judgment harmonize with the facts and law of the case</u> and be such as ought to have been rendered.

AmJur Judgments § 76 (emphasis added) (footnotes omitted). Accordingly, the Court will scrutinize the Amended Judgment to determine which interpretation would be most reasonable and effective, and best "harmonize with the facts and law of the case." In order to interpret the Amended Judgment, it is necessary, then, to examine the 2005 amendments to the foreclosure law because the state court was unquestionably implementing the amendments by incorporating a provision in the Amended Judgment that allowed the option of foreclosure by sale that had only recently been made available.

### (iii) Background of the 2005 Amendments

The amendments to the foreclosure law were presented in H. 766, sponsored by Representative Mark Young, during the 2005-2006 Legislative Session. The House Commerce Committee, as well as the

---

[8] The Court is not aware of (and the parties have not referred it to) any legislative history or state law jurisprudence that addresses how to assess a circumstance when, as happened in this case, a mortgagee initiates a strict foreclosure action but ultimately enforces its rights through a foreclosure sale (either by choice or because it cannot demonstrate the statutorily mandated equity in the property per § 4528). Under the current statute, whenever a mortgagee initiates a foreclosure action through a strict foreclosure complaint that ultimately results in a decree authorizing foreclosure by sale, there is a risk of confusion as to whether the redemption period expires at the strict foreclosure deadline set in accordance with § 4528(a) or continues through the moment of sale, in accordance with § 4532(i).

8

House and Senate Judiciary Committees, held hearings on the bill in early 2006, the Governor signed the bill shortly thereafter, and it became effective in May 2006. See Vermont Legislative Bill Tracking System, 2005-2006 Legislative Session, found at www.leg.state.vt.us/database/status/summary (last viewed 8/26/08). While the legislative history, in terms of testimony of proponents and opponents of the bill, can be found on various CDs in Montpelier, the Court has found a succinct account of the impetus behind the bill in an article entitled "Heavy Traffic at the Intersection of Mortgage Foreclosure & Bankruptcy Law," by attorney Andre D. Bouffard, appearing in the Vermont Bar Journal Spring 2006 edition.[9] In his article, Mr. Bouffard explains that this Court's disposition of the Sensenich v. Molleur (In re Chase) case, 328 B.R. 675 (Bankr. D.Vt. 2005), is what prompted the Legislature to examine and amend Vermont's strict foreclosure statute. At the time the article was published, the House had already passed H. 766 and the bill was before the Senate Judiciary Committee.

In Chase, this Court held that strict foreclosures, even when conducted in accordance with Vermont's strict foreclosure statute, could constitute a fraudulent conveyance under bankruptcy law and could be avoided if the consideration for the transfer was for less than "reasonably equivalent value." Equitable principles underlay this Court's reasoning:

> There is nothing in the [strict foreclosure] statute to prevent a foreclosing mortgagee with a debt of $2,000 from foreclosing on property worth $100,000 and retaining the property, notwithstanding the colossal surplus value of the property. When such a transfer occurs, the creditor gets a windfall, the debtor's other creditors suffer, and the purpose of fraudulent conveyance law – making all of the debtor's assets available to his or her creditors and assuring an equal distribution to similarly situated creditors – is frustrated.

Id. at 681. Chase established a procedure to assess whether a transfer effectuated through strict foreclosure constituted a fraudulent transfer, and the Legislature modified the foreclosure statutes to incorporate those equitable principles.

In his article, Mr. Bouffard asserted that, as a result of the Chase decision,

> any property with a foreclosure in the chain of title could be subject to fraudulent transfer challenge if the mortgagor files a bankruptcy petition within four years [the statute of limitations] of the foreclosure transfer. This has called into serious question the continuing viability of strict foreclosure, except in those cases where there is clearly no value in the property in excess of the debt.

32-Spg. Vt. B.J. 28, 32 (2006) (emphasis added). He observed that foreclosing mortgagees would be "well advised to opt for foreclosure by sale in any case where there is arguably any significant value in excess of the debt." Id. He concluded that strict foreclosure in Vermont would now "have very limited value, given the risks it now carries of a later challenge to title,"[10] and that mortgagees would have to take

---

[9] The printout from the Vermont Legislative Council "Committee Hearings where H.0766 was discussed," lists thirteen people who testified before the House and Senate Committees and indicates that Mr. Bouffard was one of the witnesses.

[10] Considering the practicalities of foreclosure, § 4528's new requirement of "competent evidence" of value makes the strict foreclosure process more difficult. Some Vermont trial courts have held that appraisals constitute "competent evidence" to

"great care" in availing themselves of the advantages of strict foreclosure. Id. at 33. In other words, the Chase decision, followed by the 2005 amendments, signaled the demise of strict foreclosure as the primary means for foreclosing mortgage interests against homestead properties in Vermont.

The Bouffard article explained that the rationale behind the 2005 amendments was to protect transfers of real estate effected via strict foreclosure from being avoided as fraudulent transfers in subsequent bankruptcy cases. This appears to be a well-founded explanation and the Court is aware of no other rationale for the revisions to Vermont foreclosure law. The legislation implementing those statutory protections appears to be premised on the equitable priorities of shielding mortgagors' equity in homestead properties (for the benefit of both the mortgagor and the mortgagor's creditors) and preventing mortgagees from reaping economic windfalls. It also seems that the State Legislature went to great pains when it amended Title 12 to harmonize Vermont's foreclosure statute with the Bankruptcy Code with respect to mortgages secured by homestead property. With the insight provided by the Bouffard article, the Court is persuaded that when the State Legislature revised Vermont's foreclosure statute, it did so with the express intent of avoiding the potentially inequitable results and title vulnerabilities presented by strict foreclosure.

(iv)    Interpreting the Redemption Dates in the Amended Judgment

Against this backdrop, the Court concludes that where a state court judgment provides a redemption date associated with a strict foreclosure proceeding, and also provides for a foreclosure sale (thus bringing the redemption periods under the two foreclosure procedures into conflict), and where a sale actually occurs, the foreclosure "event" is the sale and, as a result, the redemption period does not expire until the sale occurs, pursuant to § 4532(i). In such a circumstance, the strict foreclosure redemption deadline would have no force and effect. A number of rationales support this conclusion.

First, relying upon the foreclosure sale redemption date comports with how the property was actually disposed of and how the foreclosure judgment was consummated in this case – by sale. If there had been no sale, and the property had passed via strict foreclosure or the Debtor had redeemed by the first redemption deadline, then the redemption date "set" by a sale would have had no import. The actual foreclosure "event" must control. Here, the mortgagee invoked its rights under the amended statute by opting to proceed via judicial sale. It thereby relinquished its right to proceed by strict foreclosure, and the redemption deadline applicable to that procedure became moot. Whether by choice or obligation (per the new statutory requirements), the mortgagee essentially gave the Debtor a second bite of the redemption apple by effectively extending the redemption deadline until the sale. This result has certain parallels to Bartlett, where the mortgagee restored and extended redemption rights to a mortgagor which were not

---

determine fair market value, see 32 V.S.A. § 3481(a); Royal Park Corp. v. Town of Essex, 145 Vt. 376, 379 (1985). In order to complete an appraisal, the appraiser must inspect the inside of the residence being foreclosed. It is not a stretch to anticipate that a person whose residence is the subject of a pending foreclosure action might not be cooperative with the appraiser, thus making "competent evidence" required for strict foreclosure in § 4528(b) difficult to come by.

otherwise available. See Bartlett, 353 B.R. 398 ("It has long been held that it is wholly within a foreclosing mortgagee's power to grant rights to a borrower/mortgagor which might not have otherwise been available, such as by waiving the consequences of default and foreclosure, accepting payments, and/or restoring and extending redemption rights.").[11]

Second, the Court is compelled to give one of the redemption dates priority so that the Amended Judgment is reasonable and effective. The Amended Judgment directed that the Debtor must redeem by June 25, 2007, with that date being determined by the foreclosure decree (per 12 V.S.A. § 4528(a)) and also allowed for a foreclosure sale, thus invoking a redemption period that ran through the time of sale (per 12 V.S.A. § § 4532(i)). Both redemption dates cannot be given meaning: one has to trump the other. If the strict redemption date controlled and the Debtor was truly "forever barred" from redeeming the property after June 25, 2007, then the language of § 4532(i) would have no meaning. While the converse would also be true (if there is a sale, then the strict foreclosure deadline, set pursuant to § 4528, would have no meaning), the Court must construe the Amended Judgment so as to arrive at a reasonable interpretation and harmonize the facts and law of the case. See AmJur Judgments § 76. A foreclosure sale would always occur after the strict foreclosure deadline had passed. It would not be a reasonable or rational result to set a foreclosure sale but then prevent the Debtor from redeeming the property because a strict foreclosure deadline which had been set when the mortgagee was pursuing strict foreclosure, had passed. In addition, since the 2005 amendments were intended to make the foreclosure procedure more equitable, and the result has been to increase foreclosure sales, it would not be reasonable to undercut that movement toward foreclosure sales by finding that a strict foreclosure deadline would control.

Finally, by providing a sale option, the Legislature has aligned Vermont's foreclosure procedures with those of 48 other states that allow foreclosure by some form of judicial sale, and has ensured that Vermont debtors who own homestead property subject to foreclosure will have access to the same treatment in bankruptcy court as debtors in other states. To be consistent with the Bankruptcy Code, the Court must construe the Amended Judgment in a way that recognizes the mortgagor's right to redeem through the date of sale. See § 1322(c) (further discussed below).

Having determined that the Debtor had a state law right to redeem the Property until the foreclosure sale, and it being uncontested that the Debtor filed her petition three days before the sale occurred, the Court holds that the Debtor's right to redeem had not expired prior to her filing of the bankruptcy case, and hence that she had a contingent equitable interest in her Property on the date she filed her chapter 13 petition, see Taylor, 286 B.R. at 279 (citing Canney, 284 F.3d at 373).

---

[11] The state court never made the requisite findings for strict foreclosure, as required in § 4528(a) and (b), which further supports this Court's determination that the redemption date applicable to strict foreclosure should be deemed superseded by the provision for foreclosure sale.

11

## II. Does § 1322(b) Permit the Debtor to De-Accelerate and Reinstate Her Mortgage?

The Court turns to § 1322 of the Bankruptcy Code to determine precisely what impact the Debtor's bankruptcy filing had on her rights vis a vis her mortgage. Section § 1322 is "uniquely tailored to protect homeowners' primary residences." In re Taylor, 286 B.R. 275, 279 (D.Vt. 2002). It provides, in relevant part, that a Chapter 13 plan may –

> (b)(2)  modify the rights of holders of secured claims, <u>other than a claim secured only by a security interest in real property that is the debtor's principal residence</u>, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;
> \* \* \*
> (c)  Notwithstanding subsection (b)(2) and applicable nonbankruptcy law –
> (1)  a <u>default</u> with respect to, or that gave rise to, a lien on the debtor's principal residence <u>may be cured</u> . . . <u>until such residence is sold at foreclosure sale</u> that is conducted in accordance with applicable nonbankruptcy law.

11 U.S.C. § 1322(b)(2), (c)(1) (emphasis added). In In re Taddeo, 685 F.2d 24 (2d Cir. 1982), the Second Circuit held that § 1322 "was intended to permit the cure and de-acceleration of secured long-term residential debt accelerated prior to the filing of a Chapter 13 petition," based on its reading of the provision's legislative history and policy. Id. at 27. The panel concluded that "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences [of the default] are thus nullified," id. at 26-27, and permitted the debtors to cure their default on a 15-year mortgage and then maintain regular mortgage payments. Id. at 28. The Second Circuit rejected the mortgagee's argument that because it could accelerate the mortgage under state law, the mortgagors could cure only as provided by state law – a result that would "be totally at odds with the overriding rehabilitative purpose of Chapter 13." Id. at 29 (quotation omitted).

Two decades after Taddeo, the U.S. District Court explained how the right to cure in chapter 13 intersects with Vermont foreclosure law. The court observed that the plain language of § 1322(c)(1)

> provides an independent right to cure under the Bankruptcy Code, apart from the debtor's right to redeem under state law . . . Under the express terms of Section 1322(b)(1), a homeowner can cure a default on her principal residence until that residence is sold at a foreclosure sale under the applicable nonbankruptcy law. See In re Beeman, 235 B.R. 519, 523 (Bankr. D.N.H. 1999) ("In essence, §§ 1322(b) and (c) allow a Chapter 13 debtor to cure and reinstate a mortgage on the debtor's principal residence up until the time 'such residence is sold at a foreclosure sale'").

286 B.R. at 280 (internal quotation and citation omitted).

In this case, because the Debtor had a contingent equitable interest in the Property when she filed her chapter 13 petition, and because the state court had set a foreclosure sale that had not yet occurred, the Debtor could benefit from the independent federal right, provided by § 1322, to nullify the mortgage acceleration, and to propose a plan to cure the pre-petition default – notwithstanding the entry of the state

12

court Amended Judgment which set an earlier redemption deadline. In bankruptcy, the event which would have terminated the Debtor's interest in the Property – and her right to invoke § 1322 relief – was the foreclosure sale. At the moment she filed her chapter 13 petition, whether she had the right to de-accelerate her mortgage and cure her arrears was dependent upon whether the sale had occurred. It had not.

The Creditors assert that the Debtor is precluded from taking advantage of § 1322 by virtue of the merger doctrine. They contend that "where a claim on a contract is reduced to judgment, the contract between the parties is voluntarily surrendered and cancelled by merger in the judgment and ceases to exist," and that because "all the prior contractual rights are merged into and extinguished by the judgment, thereafter the parties have only those rights as are set forth in the judgment itself and the contract no longer serves any purpose as of the date of the judgment" (doc. # 102, p. 2). This may be the outcome in state court, where the mortgage merges into the foreclosure judgment, but it is not the outcome in bankruptcy court where a mortgagor may rely upon § 1322 to provide an independent federal right to reinstate the mortgage and cure the arrearage through a plan of reorganization. See Taylor, 286 B.R. at 283.

While acknowledging that § 1322 provides a debtor the right to reinstate a mortgage, the Creditors argue that that right may only be asserted if a cure plan is confirmed by the Court. They reason that since the Debtor never had any plan confirmed and the Court granted the Bank relief from stay to pursue its state court rights, the Debtor had lost her opportunity to reinstate the mortgage pursuant to § 1322 (doc. # 123). This logic is flawed. Section 1322 concerns contents of a plan, and subsections (b) and (c) allow a debtor to propose a plan that will de-accelerate a mortgage and cure the default on a principal residence. Since a plan is filed at or near the beginning of a case, confirmation is not a pre-requisite to exercising the independent federal right contained in § 1322. The only prerequisite is that a debtor file a chapter 13 case before the foreclosure sale. The Debtor's first Plan (doc. # 15, filed October 11, 2007) included a provision for curing the arrears on her homestead and for paying the mortgage outside of the plan.[12] The Court rejects the argument proffered by the Creditors, and concludes that the doctrine of merger is inapplicable, the Debtor had an interest in the Property on the filing date, and the Debtor therefore had the right to reinstate the mortgage under § 1322.

### III. May the Debtor Deduct the Mortgage Payment as a Monthly Expense on the Means Test?

The Creditors ultimate position is that the Debtor had no right to include her mortgage payment as a monthly expense on the means test when calculating her monthly disposable income. They contend that she had no property interest in her home on the date she filed for bankruptcy and therefore her mortgage payments could not be "scheduled as contractually due" pursuant to § 707(b)(2)(A)(iii)(I) and line 47 of the means test. This argument has no traction, as the Court has determined that the Debtor did have an

---

[12] The First Amended Plan (doc. # 55), filed in January 2008, and Second Amended Plan (doc. # 82), filed in March 2008, did not include provisions for curing the mortgage arrearage.

interest in her Property when she filed her petition. The Creditors go on to claim that events subsequent to filing – such as the Debtor's alleged consent to relief from stay, her eviction, and her failure to propose a confirmable plan that included retention of her Property and payment of the mortgage – provide an equitable basis for denying the mortgage deduction on the means test with its concomitant diminution of the dividend to general unsecured creditors. In support of this argument, they cite cases such as In re Edighoffer, 375 B.R. 789 (Bankr. N.D. Ohio 2007) and In re Burden, 380 B.R. 194 (Bankr. W.D.Mo. 2007), which hold that chapter 7 debtors who indicated their intention to surrender collateral could not take deductions for debts secured by that collateral on the means test and that such deductions triggered the presumption of abuse under § 707(b)(2) and (b)(3), respectively. The Creditors argue that those holdings apply here by analogy (## 102, 111, 123). The Court disagrees.

Some of the key facts upon which the Creditors purport to rely in support of their argument are inconsistent with the record in this case. The Debtor's first Plan, filed in October 2007 (doc. # 15), did include a provision to cure the mortgage arrearage. Assuming arguendo that the Debtor's intent concerning disposition of the Property is relevant at all and may be determined from that filing, it would appear that, at the outset, the Debtor did intend to keep the Property and made the requisite provision in her plan to do so. In addition, the Debtor never consented to relief from stay; she opposed it (doc. # 35). Also, Edighoffer and Burden are factually distinct from this case because those courts found it significant that the debtors' Statements of Intent revealed their plans to dispose of the property at issue, which showed that, even at the moment of filing, the debtors did not intend to keep their homes.

Those cases are also procedurally distinct because they are chapter 7 cases involving motions to dismiss, where the U.S. Trustee asserted that the debtors' deductions for items they intended to surrender triggered the Code's presumption of abuse under §§ 707(b)(2) and (b)(3). Nevertheless, cases focusing on a debtor's intent to surrender secured collateral may be helpful to the extent that they address the relevance of post-filing events in the context of interpreting the phrase "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition" found in § 707(b)(2)(A)(iii).

The most helpful cases, however, are chapter 13 cases that examine whether mortgage deductions on the means test are "contractually due." A leading case is In re Burmeister, 378 B.R. 227 (Bankr. N.D. Ill. 2007), where the court first set out the statutory context for monthly disposable income (where monthly income and deductions such as mortgage payments are calculated):

> Under section 1325(b)(2), a debtor's disposable income is figured by subtracting from "current monthly income" (a term itself defined in section 101(10A), 11 U.S.C. § 101(10A)) "amounts reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." Under section 1325(b)(3), the "amounts reasonably necessary" for a debtor whose income exceeds the median income in his home state "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." 11 U.S.C. § 1325(b)(3). Section 707(b)(2)(A) requires

14

a debtor to subtract certain expenses from "current monthly income." 11 U.S.C. § 707(b)(2)(A). One of the expenses a debtor must subtract is "the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition." 11 U.S.C. § 707(b)(2)(A)(iii)(I).

Id. at 230. The Burmeister Court then analyzed the "scheduled as contractually due" phrase in § 707(b)(2)(A)(iii)(I),[13] and the relevant point in the process where the debtor can properly make the deductions:

> The phrase "contractually due" . . . means a legal obligation under a contract, an obligation the debtor owes. In re Walker, No. 05-15010, 2006 WL 1314125, at *3 (Bankr.N.D.Ga. May 1, 2006). It makes no difference whether the debtor has actually been paying the obligation or intends to keep paying it. In re Hartwick, 359 B.R. 16, 19 (Bankr.D.N.H.2007); see also In re Benedetti 372 B.R. 90, 95 (Bankr. S.D.Fla.2007) (stating that the phrase "scheduled as contractually due to secured creditors" does not require that the debt actually be paid post-petition). Nor does it make a difference whether the debtor intends to surrender the collateral securing the obligation. In re Randle, 358 B.R. 360, 362-63 (Bankr.N.D.Ill.2006), aff'd sub nom. Randle v. Neary (In re Randle), No. 07 C 631, 2007 WL 2668727 (N.D.Ill. July 20, 2007); In re Simmons, 357 B.R. 480, 485-86 (Bankr.N.D.Ohio 2006). Amounts "scheduled as contractually due" are determined as of the petition date. In re Hayes, 376 B.R. 55, 63 (Bankr.D.Mass. 2007).

Id. (footnote omitted). In Burmeister, the debtors owned the property in question on the date they filed their petition, and it was not in foreclosure. However, they indicated in their Statement of Intention that they wished to surrender the property and they had stopped making mortgage payments. The court ruled that these facts were "beside the point," that the payments "were nonetheless 'contractually due' and so had to be deducted under section 707(b)(2)(A)(iii)(I)." Id. at 231 (quoting 6 Keith M. Lundin, Chapter 13 Bankruptcy § 485.1 at 485-2 (3d ed. 2000 and Supp. 2006), and noting that amounts "contractually due" under this provision will "include amounts that will never be paid through any Chapter 13 plan because . . . the collateral will be surrendered"). The court held that the debtors had "correctly deducted the mortgage payments . . . and correctly calculated their disposable income." Id. See In re Quigley, 391 B.R. 294, 310 (Bankr. N.D.W.Va. June 20, 2008) ("Importantly, § 1325(b)(3) directs that the expenses for an above the median income Chapter 13 debtor 'shall be determined in accordance with' § 707(b)(2). . . . [Section] 707(b)(2)(A)(iii)(I) makes no provision for a debtor's anticipated changes in expenses.") (emphasis added); In re Lindstrom, 381 B.R. 303, 304 (Bankr. D. Colo. 2007) (observing that "[i]f Congress had intended to permit the deduction of only those payments that would actually be made post-

---

[13] The Burmeister interpretation of the phrase "scheduled as contractually due" has become the majority position in bankruptcy courts. See In re Allen, 2008 WL 451053 * 4 & n.11 (Bankr. D.Kan. Feb. 15, 2008) (a chapter 13 case that describes chapter 7 cases interpreting "scheduled as contractually due" in accord with Burmeister as "the majority approach"); Anderson, 383 B.R. at 707-08 (applying majority position to chapter 13 cases). The minority approach interprets the word "scheduled" in "scheduled as contractually due" as having a "bankruptcy-specific meaning which refers to how the debt is listed in a debtor's schedules and statements." In re Burden, 380 B.R. at 200. Numerous courts have pointed out the flaws in this reasoning. See, e.g., In re Sorrell, 359 B.R. 167, 185-86 (Bankr. S.D.Ohio 2007).

petition, Congress could have done so."); In re Walker, 2006 WL 1314125 at * 4 (Bankr. N.D. Ga. May 1, 2006) ("The debtor's contractual liability for the debt is not eliminated upon the surrender of the collateral. . . . In other words, nothing the debtor does or does not do changes the fact that the scheduled payments remain contractually due.")

This Court agrees with the Burmeister line of cases that neither the Debtor's intent nor post-petition events affect the Debtor's right to include the monthly mortgage payment on the means test if the Debtor had a note in effect regarding that debt on the date she filed for bankruptcy relief. The relevant point in time that determines whether a debtor may take a deduction for secured claims on the means test is the petition date, not later.[14] The Court is persuaded that the events that transpired after the Debtor filed for bankruptcy had no bearing on the mortgage expense that she could include on her means test as being "contractually due" when she filed for protection under chapter 13.[15]

The Trustee accurately observed that identifying the date of filing as the critical date, and not allowing post-petition changes in circumstances to figure into the computation of disposable income, is consistent with this Court's earlier decision in In re Austin, 372 B.R 668 (Bankr. D. Vt. 2007). Although the thrust of that decision was the proper interpretation of the term "projected disposable income" in § 1325(b), the Court opined that the post-BAPCPA means test requires courts to apply a mechanical formula, without regard to the figures in Schedules I and J (the actual current budget), in order to determine an above-median debtor's monthly disposable income under § 1325(b)(2). Id. at 680. As to the expense side of the equation, this Court aligned itself with those bankruptcy courts that focus on the "expense figures that are in effect on the petition date, as opposed to figures that may change with the passage of time or with a change in the debtor's lifestyle." In re Walker, 2006 WL 1314125 at * 5 (Bankr. N.D.Ga. May 1, 2006). The Walker Court articulates that the pertinent expenses are those "in effect on the petition date, rather than those expenses that will be in effect during the sixty months following the filing

---

[14] There are two other lines of bankruptcy cases concerning whether a chapter 13 debtor may, for purposes of calculating monthly disposable income, deduct monthly payments for debt secured by property that the debtors plan to surrender. However, these cases focus on the phrase in § 1325(b)(1)(B) "as of the effective date of the plan" – an issue which was not raised here. Compare In re Van Bodegom Smith, 383 B.R. 441, 451-52 (Bankr. E.D.Wis. 2008) (concluding that the phrase modifies all of § 1325(b)(1)(B), such that the calculation of the debtor's projected disposable income is made as of the effective date of the plan – i.e., at the point of confirmation – the plan becomes the new contract and payments scheduled as contractually due must be viewed in reference to the plan and surrendered property cannot therefore be deducted), with Burmeister, 378 B.R. at 230-31 (concluding that the "effective date" language modified "the plan provides" in § 1325(b)(1)(B), not "disposable income," dictating when the plan provides payment of the debtor's disposable income; what that income is depends on § 707(b)(2), and the calculation of disposable income is made as of the petition date, not the confirmation date). In the circumstances presented here, where § 1322 reinstates the mortgage contract, the Van Bodegom Smith analysis is inapposite.

[15] In this case, the Debtor did not "own" her foreclosed house when she filed her petition, but she nevertheless had an equitable, contingent interest in her Property that became part of the bankruptcy estate. Section § 1322 immediately transformed the Debtor's interest. Instead of requiring an accelerated payment, according to state foreclosure judgment, § 1322(c)(1) de-accelerated and reinstated the mortgage. As a result, upon filing her chapter 13 petition – on the petition date – the Debtor once again became contractually obligated to make her mortgage payments, permitting her to deduct her regular mortgage payment on the means test because it was "contractually owed by the debtor[ ] to secured parties as of the petition date." In re Anderson, 383 B.R. 699, 706 (Bankr. S.D.Ohio 2008).

of the petition. . . . When applying a test that essentially judges the debtor's financial situation as it exists at the time of filing, it would be inconsistent to consider post-petition events to determine whether the debtor is entitled to deduct secured debt payments." Id. This Court agrees.

The Court is acutely aware that there are sometimes surprising, and at times inequitable or anomalous, consequences that arise when calculating monthly disposable income for above-median debtors, under the mandates established by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). It expressed its dismay at such consequences in the Austin case, see 372 B.R. at 678-80. Here, too, the Court notes that if the Debtor's post-petition circumstances relating to the Property (relief from stay, eviction from the house, foreclosure sale, and non-payment of the mortgage) were taken into account, the plan payment would more accurately reflect the Debtor's true financial condition and the funds she actually had available to pay unsecured creditors. However, the Court is duty-bound to apply § 707(b)(2)(A)(iii)(I), as reflected in the means test, to the disadvantage of the Debtor's creditors. The Burmeister Court made a similar observation when it addressed a comparable situation:

> The result here understandably rankles the trustee: why should the Burmeisters be able to lower their disposable income, paying unsecured creditors less under their plan, by deducting mortgage payments they are not making and will never make? The answer, satisfying or not, is that Congress said so in sections 1325(b)(3) and 707(b)(2)(A)(iii)(I) of the Code. Congress meant the disposable income calculation under BAPCPA to be mechanical. In re Austin, 372 B.R. 668, 676-77 (Bankr.D.Vt.2007); In re Gress, 344 B.R. 919, 922 (Bankr.D.Mo.2006). Although the consequence is that above-median debtors now figure their disposable income "based on a sort of parallel universe," Gress, 344 B.R. at 922, that was Congress's intention. In requiring deductions based on payments that are "contractually due," section 707(b)(2)(A)(iii)(I) is clear on its face. "If Congress intended to limit secured debt payments contractually due from debtors on the petition date to those where actual future payments will be made ..., it knew how to do so." In re Oliver, No. 06-30076RLD13, 2006 WL 2086691, at *3 (Bankr.D.Or. June 29, 2006).

Burmeister, 378 B.R. at 231. Finding a remedy for the anomalies created by BAPCPA, however, is beyond the role of the courts, and lies solely with Congress.[16]

In sum, the plain language of the Bankruptcy Code permits the Debtor to deduct her mortgage payment on her means test form, and to use the resulting figure to determine her monthly payment to general unsecured creditors in her plan, whether or not she will actually be making the mortgage payment – or even retains a property interest in the collateral securing the debt – during the term of the plan.

---

[16] Burmeister also alludes to a remedy that could serve to allay some of the manifest unfairness of allowing a debtor to deduct as an expense a payment that he or she has not made since the filing of the petition. "Section 1329 allows a plan to 'be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim.' 11 U.S.C. § 1329(a). One permissible modification is an increase in plan payments. 11 U.S.C. § 1329(a)(1). . . . A motion to modify a confirmed plan, rather than an objection to the plan's confirmation, is the way to counter the peculiar effects of the disposable income calculation for above-median debtors." 378 B.R. at 232.

17

### IV. What Is the Proper Amount of the Mortgage to be Included on the Means Test?

Having found that the Debtor may deduct her mortgage payment as a monthly expense on the means test, the remaining question is which amount should be included when, as here, the mortgage was accelerated in a pre-petition foreclosure judgment. In the last-filed version of her means test, the Debtor put $3,025.17 on line 47(a), representing the accelerated monthly mortgage amount divided by 60 (since she was required to propose a 60-month plan), (Ex. to doc. 99), rather than the $1,550.43 monthly payment set out in the mortgage note (doc. # 26). The Debtor contends that she is "entitled to deduct her entire mortgage amount due as of the date of the filing," and reasons that "the fact that there was a judgment in foreclosure issued at the time the case was filed means that under the contract, the entire amount of the debt was due" (doc. # 99).

The Court finds the Debtor's rationale on this point to be flawed. The Debtor must use the payment set out in the mortgage note, $1,550.43, since it is that note that was reinstated upon the filing of her petition. Section 1322(c)(1) provides that a debtor's default on his or her principal residence may be cured pursuant to chapter 13, and Taddeo instructs that "the power to cure must comprehend the power to 'de-accelerate.'" 685 F.2d at 26. A mortgage that has been accelerated by state court foreclosure proceedings is de-accelerated when a debtor files a chapter 13 plan that proposes to cure the arrears in accordance with § 1322. Once the mortgage is de-accelerated, the terms of the mortgage and note are reinstated. This result is mandated by the legislative history and comments to § 1322, which states, "It is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred." House Report (Reform Act of 1994), Comment to § 1322(e).

### V. Impact of These Holdings on Debtor's Proposed Plan

Since the Debtor had a contingent, equitable interest in her Property on the date she filed her chapter 13 petition, she may invoke the powers of § 1322(c)(1) to de-accelerate and reinstate her mortgage. She also had the right to deduct a mortgage payment on the means test. Hence, on these three points, the Creditors' arguments fail.

However, if the Debtor is going to deduct the mortgage payment, as she may, she must deduct her $1,550.43 regular monthly mortgage amount on line 47(a) of the means test: that is the amount that is contractually due to the mortgagee. Using the figures on the means test filed with doc. # 99, the total of all deductions (from lines 38, 46, and 51) is $7,027.24. The Debtor's current monthly income, on line 53, is $7,811.37. Subtracting the deductions from the income leaves a monthly disposable income figure under § 1325(b)(2) of $784.13 which the Debtor would be required to pay to unsecured creditors. As a result, the Debtor's monthly disposable income of minus $990.61 on her last means test (doc. # 99) (resulting in no payment to general unsecured creditors) is incorrect. Here the Creditors' argument prevails: the Debtor failed to devote all of her monthly disposable income to her most recently filed plan.

## CONCLUSION

For the reasons set forth above, the Court makes the following findings of fact and conclusions of law. First, the Debtor had a contingent, equitable interest in her Property on the date she filed her bankruptcy petition because (a) the mortgagee which initiated strict foreclosure proceedings in state court opted for a foreclosure sale, pursuant to the Amended Judgment; (b) 12 V.S.A. § 4532(i) operated to extend the redemption date through the date of sale; and (c) the foreclosure sale had not yet occurred. Second, once the Debtor filed her chapter 13 case, § 1322(c)(1) of the Bankruptcy Code allowed her to de-accelerate and reinstate her mortgage, and propose a plan to cure the monetary default. Third, it was appropriate for the Debtor to include the mortgage payment as a deduction on her means test form as a secured claim that was contractually due. Fourth, the Debtor should have inserted the amount of the regular monthly mortgage payment, rather than the accelerated amount, as the monthly mortgage expense figure on her means test form, yielding a monthly payment of $784.13 to the general unsecured creditors.

Accordingly, the Court overrules the Creditors' objection to the extent it asserts that the Debtor had no property interest in her home on the date she filed her petition, that she could not use § 1322 to de-accelerate and reinstate her mortgage, and that she was not entitled to deduct the mortgage expense on her means test computation of the plan payment. The Court sustains the Creditors' objection to the extent that it asserts that the Debtor was not paying all of her projected disposable income into her plan, as required by § 1325.

This constitutes the Court's findings of fact and conclusions of law.

October 17, 2008  
Rutland, Vermont

Colleen A. Brown  
United States Bankruptcy Judge